**In the United States District Court
for the Southern District of Ohio
Western Division**

| | |
|---|---|
| Kyle Arledge, | |
| *On behalf of himself and those similarly situated*, | Case No. 16-386 |
| Plaintiff, | Judge |
| v. | Magistrate Judge |
| Domino's Pizza, Inc., Domino's Pizza, LLC, Domino's Pizza Franchising, LLC, TJK-ELS, Inc., TJK-ELS West End, Inc., Christopher T. Koehler, and Edward T. Schlater, Jr. | Jury Demand Endorsed Hereon |
| Defendants. | |

**Class and Collective Action Complaint**

## PRELIMINARY STATEMENT

1.      Kyle Arledge, on behalf of himself and all similarly-situated individuals, brings this action against Defendants Domino's Pizza, Inc., Domino's Pizza, LLC, and Domino's Pizza Franchising, LLC (collectively "Domino's"); TJK-ELS, Inc., and TJK-ELS West End, Inc. (collectively "TJK-ELS"); Christopher T. Koehler ("Koehler"); and Edward T. Schlater, Jr. ("Schlater"). Mr. Arledge seeks appropriate monetary, declaratory, and equitable relief based on Defendants' willful failure to compensate Plaintiff and similarly-situated individuals with minimum and overtime wages as required by the Fair Labor Standards Act ("FLSA"), the Ohio Minimum Fair Wage Standards Act ("OMFWSA"), the Ohio Constitution, and O.R.C. § 4113.15.

2.      According to its 2015 Annual Report, Domino's is the second largest pizza company in the world, and the number one pizza delivery chain in the United States, holding approximately 28% of the total market share for pizza delivery.

3.      In 2015, Domino's restaurants grossed $9,700,000,000.00 on delivery sales.

4.      In 2015, ninety-three percent (4,816 out of 5,200) of Domino's restaurants nationwide were owned by franchisees.

5.      Domino's receives its largest portion of sales and profits – approximately $272.8 million in 2015 revenues – through its franchise stores.

6.      TJK-ELS is one of Domino's' franchisees.

7.      TJK-ELS, owned and operated by Koehler and Schlater, runs approximately twenty Domino's franchise stores in the Dayton, Ohio area, and one location in Richmond, Indiana (the "Dayton Regional Stores").

8.      Plaintiff and his similarly situated delivery drivers at franchise stores such as the Dayton Regional Stores are the lynchpin of Domino's' entire organization.  Their work is essential to Domino's' cause.

9.      Domino's, TJK-ELS, Koehler, and Schlater (collectively, "Defendants") jointly employed Plaintiff and similarly-situated delivery drivers at all times relevant.

10.    At all relevant times, Defendants shared or co-determined those matters governing the essential terms and conditions of employment for Plaintiff and similarly situated delivery drivers.

11.    At all relevant times, all Defendants had direct or indirect control over the terms and conditions of Plaintiff's work and the work of similarly situated delivery drivers.

4811-0304-2865, v. 1

12.     At all relevant times, all Defendants possessed the authority to control the terms and conditions of Plaintiff's employment and the employment of similarly situated delivery drivers, and have exercised that authority.

13.     Together, Defendants repeatedly violated the Fair Labor Standards Act, the Ohio Constitution, and the Ohio Minimum Fair Wage Standards Act, by failing to adequately reimburse delivery drivers for their delivery expenses, and thereby failing to pay delivery drivers the legally mandated minimum wage for all hours worked, and minimum overtime rate for hours worked in excess of 40 per workweek.

14.     Defendants maintain a policy and practice of underpaying their delivery drivers in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, the Ohio Constitution, Art. II, § 34a ("Section 34a"), and the Ohio Minimum Fair Wage Standards Act, O.R.C. § 4111.01, *et seq.* (the "OMFWSA"), and O.R.C. § 4113.15.

15.     Defendants maintain a policy and practice of failing to reimburse delivery drivers for costs and expenses essential to their employment, including but not limited to automobile costs, gasoline, insurance, automobile maintenance expenses, cell phone expenses, GPS expenses, and other job-related expenses, causing Plaintiff's and similarly situated delivery drivers' wages to fall below minimum wage.

16.     At all relevant times, Defendants have failed to take reasonable steps to ensure delivery drivers received adequate reimbursement for their automobile and other job-related expenses.

17.     All delivery drivers at the Dayton Regional Stores, including Plaintiff, are subject to the same employment policies and practices, including policies and practices with respect to wages and out-of-pocket expenses.

18.     Plaintiff brings this action on behalf of himself and similarly situated current and former delivery drivers who elect to opt in pursuant to FLSA, 29 U.S.C. § 216(b) to remedy violations of the FLSA wage and hour provisions by Defendants.

19.     Plaintiff also brings this action on behalf of himself and similarly situated current and former delivery drivers in Ohio, pursuant to Federal Rule of Civil Procedure 23, to remedy violations of Section 34a, the OMFWSA, and O.R.C. § 4113.15.

## JURISDICTION AND VENUE

20.     This action is brought pursuant to the FLSA, 29 U.S.C. §201, *et seq.*, the Ohio Constitution Art. II, § 34a, the OMFWSA, O.R.C. § 4111, *et seq.*, O.R.C. § 4113.15, and 28 U.S.C. §1331 and §1343(a)(4).

21.     Jurisdiction is conferred upon this Court by 28 U.S.C. §1331, which provides for original jurisdiction of Plaintiff's claims arising under the laws of the United States and over actions to secure equitable and other relief.

22.     This Court's jurisdiction is also predicated upon 28 U.S.C. §1367 as this Class Action Complaint raises claims pursuant to the laws of Ohio, over which this Court maintains supplemental subject matter jurisdiction.

23.     Venue is proper in this forum pursuant to 28 U.S.C. §1391, because Plaintiff entered into an employment relationship with Defendants in the Southern District of Ohio and performed his job duties here. Furthermore, Defendants are doing and have done substantial business in the Southern District of Ohio.

## PARTIES

**Plaintiff**

**Kyle Arledge**

24.     Plaintiff Kyle Arledge is a citizen of the United States and resides in the Southern District of Ohio.  Further, at all times material herein Plaintiff worked within the boundaries of Southern District of Ohio.

25.     At all times relevant herein, Plaintiff was an "employee" of Defendants as defined in the FLSA, the OMFWSA, and Section 34a.

26.     Plaintiff has given written consent to join this action, a copy of which is attached to this Class Action Complaint.

**<u>Defendants</u>**

27.     Defendants have jointly employed Plaintiff and similarly situated delivery drivers at all times relevant.

28.     Each of the Defendants had substantial control over Plaintiff and similarly situated delivery drivers' working conditions, and over the unlawful policies and practices alleged herein.

29.     Defendants are part of a single integrated enterprise.

30.     At all relevant times, the Dayton Regional Stores shared common management and were centrally controlled and/or owned by all Defendants.

31.     At all relevant times, all Defendants maintained control over labor relations at the Dayton Regional Stores.

32.     During all relevant times, Defendants permitted employees to transfer or be shared by and between the Dayton Regional Stores without retraining.

33.     Defendants share or co-determine those matters governing the essential terms and conditions of employment for Plaintiff and similarly situated delivery drivers at the Dayton Regional Stores.

5

34.     Defendants suffer or permit Plaintiff and other delivery drivers to work.

35.     Defendants have direct or indirect control of the terms and conditions of Plaintiff's work and the work of similarly situated delivery drivers.

36.     Domino's possesses the authority to control employees' terms and conditions of employment at the Dayton Regional Stores, and also exercises that authority.

37.     During all relevant times, Defendants exercised operational control over the delivery drivers at the Dayton Regional Stores, including, but not limited to, control over recruiting and training of delivery drivers, compensation of delivery drivers, job duties of delivery drivers, reimbursements to delivery drivers, recruiting and training of managers, design and layout of the Dayton Regional Stores, sales and marketing programs, public relations programs, promotional services, appearance and conduct standards, and inventory controls.

**Domino's Pizza, Inc.**

38.     Defendant Domino's Pizza, Inc. is a foreign corporation organized under the laws of the state of Delaware, with its principal place of business in Michigan.  Domino's Pizza, Inc. does business as "Domino's Pizza" in the Southern District of Ohio.

39.     Domino's Pizza, Inc. is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

40.     Upon information and belief, Domino's Pizza, Inc. applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

6

41. At all relevant times, Domino's Pizza, Inc. maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, expense reimbursements, and other practices.

42. At all relevant times, Domino's Pizza, Inc. has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

43. Domino's Pizza, Inc.'s gross revenue exceeds $500,000 per year.

**Domino's Pizza, LLC**

44. Defendant Domino's Pizza, LLC is a foreign limited liability company organized under the laws of the state of Michigan and doing business as "Domino's Pizza" in the Southern District of Ohio.

45. Domino's Pizza, LLC is a wholly owned subsidiary of Domino's Pizza, Inc.

46. Domino's Pizza, LLC is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

47. Upon information and belief, Domino's Pizza, LLC applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

48. At all relevant times, Domino's Pizza, LLC maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, expense reimbursements, and other practices.

7

49.     At all relevant times, Domino's Pizza, LLC has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

50.     Domino's Pizza, LLC's gross revenue exceeds $500,000 per year.

**Domino's Pizza Franchising, LLC**

51.     Defendant Domino's Pizza Franchising, LLC is a foreign limited liability company organized under the laws of the state of Delaware, with its principal place of business in Michigan.  Domino's Pizza Franchising, LLC does business as "Domino's Pizza" in the Southern District of Ohio.

52.     Domino's Pizza Franchising, LLC is a wholly owned subsidiary of Domino's Pizza, Inc.

53.     Domino's Pizza Franchising, LLC is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

54.     Upon information and belief, Domino's Pizza Franchising, LLC applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

55.     At all relevant times, Domino's Pizza Franchising, LLC maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, expense reimbursements, and other practices.

4811-0304-2865, v. 1

56.     At all relevant times, Domino's Pizza Franchising, LLC has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

57.     Domino's Pizza Franchising, LLC's gross revenue exceeds $500,000 per year.

**TJK-ELS, Inc.**

58.     Defendant TJK-ELS, Inc. is a domestic corporation doing business as "Domino's Pizza" in the Southern District of Ohio.

59.     TJK-ELS, Inc. was incorporated on August 18, 2008 by incorporators, owners, and operators Koehler and Schlater.

60.     TJK-ELS, Inc. is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

61.     TJK-ELS, Inc. is the corporate entity that appears on paystubs Plaintiff receives for work completed for Defendants.

62.     Upon information and belief, TJK-ELS, Inc. applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

63.     At all relevant times, TJK-ELS, Inc. maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, expense reimbursements, and other practices.

64.     At all relevant times, TJK-ELS, Inc. has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

9

65.     TJK-ELS, Inc.'s gross revenue exceeds $500,000 per year.

**TJK-ELS West End, Inc.**

66.     Defendant TJK-ELS West End, Inc. is a domestic corporation doing business as "Domino's Pizza" in the Southern District of Ohio.

67.     TJK-ELS West End, Inc. was incorporated on August 18, 2008 by incorporators, owners, and operators Koehler and Schlater.

68.     TJK-ELS West End, Inc. is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

69.     Upon information and belief, TJK-ELS West End, Inc. applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

70.     At all relevant times, TJK-ELS West End, Inc. maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, expense reimbursements, and other practices.

71.     At all relevant times, TJK-ELS West End, Inc. has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

72.     TJK-ELS West End, Inc.'s gross revenue exceeds $500,000 per year.

**Christopher T. Koehler**

73.     Defendant Christopher T. Koehler is one of two Franchise Owners of the Dayton Regional Stores.

74.     Upon information and belief, Koehler resides in Englewood, Ohio.

75.     Together with Schlater, Koehler incorporated TJK-ELS, Inc. and TJK-ELS West End, Inc. on August 18, 2008 to operate the Dayton Regional Stores.

76.     At all relevant times, Koehler has been an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

77.     Koehler began working for Domino's in 1984 as a delivery driver.

78.     Koehler rose through the ranks as a general manager, then an operating partner, before buying nineteen Dayton, Ohio-area stores in 2008 with Schlater.

79.     Like more than ninety percent of Domino's franchise owners, Koehler learned to run, operate, and supervise multiple Domino's locations, and proved he could implement Domino's' operations system, before becoming a franchise owner.

80.     At all relevant times, Koehler has been actively involved in managing the operations of the Dayton Regional Stores.

81.     Koehler still works as a manager in the Dayton Regional Stores.  He still wears a Domino's crew member uniform, makes pizzas, cleans the Dayton Regional Stores, and delivers pizzas.

82.     At all relevant times, Koehler had control over Defendants' pay policies and the unlawful policies and practices alleged herein.

83.     At all relevant times, Koehler had power over personnel and payroll decisions at the Dayton Regional Stores.

84.     At all relevant times, Koehler had the power to stop any illegal pay practices that harmed Plaintiff and similarly situated employees.

85.     At all times relevant, Koehler had the power to transfer the assets and liabilities of TJK-ELS.

11

86.     At all relevant times, Koehler had the power to declare bankruptcy on behalf of TJK-ELS.

87.     At all relevant times, Koehler had the power to enter into contracts on behalf of TJK-ELS.

88.     At all relevant times, Koehler had the power to close, shut down, and/or sell TJK-ELS.

**Edward T. Schlater, Jr.**

89.     Defendant Edward T. Schlater, Jr. is one of two Franchise Owners of the Dayton Regional Stores.

90.     Upon information and belief, Schlater resides in Englewood, Ohio.

91.     Together with Koehler, Schlater incorporated TJK-ELS, Inc. and TJK-ELS West End, Inc. on August 18, 2008 to operate the Dayton Regional Stores.

92.     At all relevant times, Schlater has been an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

93.     Like more than ninety percent of Domino's franchise owners, Schlater learned to run, operate, and supervise multiple Domino's locations before becoming a franchise owner.

94.     At all relevant times, Schlater has been actively involved in managing the operations of the Dayton Regional Stores.

95.     At all relevant times, Schlater had control over Defendants' pay policies and the unlawful policies and practices alleged herein.

96.     At all relevant times, Schlater had power over personnel and payroll decisions at the Dayton Regional Stores.

12

97.     At all relevant times, Schlater had the power to stop any illegal pay practices that harmed Plaintiff and similarly situated employees.

98.     At all times relevant, Schlater had the power to transfer the assets and liabilities of TJK-ELS.

99.     At all relevant times, Schlater had the power to declare bankruptcy on behalf of TJK-ELS.

100.    At all relevant times, Schlater had the power to enter into contracts on behalf of TJK-ELS.

101.    At all relevant times, Schlater had the power to close, shut down, and/or sell TJK-ELS.

## FACTS

### CLASSWIDE FACTUAL ALLEGATIONS

102.    During all relevant times, Defendants have operated the Dayton Regional Stores, twenty Domino's Pizza locations in the Dayton, Ohio area, and one location in Richmond, Indiana.

103.    The primary function of the Dayton Regional Stores is to sell pizza and other food items to customers, whether they carry out or have their food delivered.

104.    Each of the Dayton Regional Stores employs delivery drivers who are primarily responsible for delivering pizzas and other food items to customers' homes and workplaces.

105.    Plaintiff and the similarly situated persons Plaintiff seeks to represent are current and former delivery drivers employed by Defendants at the Dayton Regional Stores.

106.    All delivery drivers employed at the Dayton Regional Stores over the last three years have had essentially the same job duties—deliver pizza and other food items to customers.

13

107.   When there are no deliveries to make, Defendants' delivery drivers are required to work inside the Dayton Regional Stores building pizza boxes, cleaning, preparing pizza and other food items, taking orders, and completing other duties inside the restaurant as necessary.

108.   At all relevant times, Plaintiff and similarly situated delivery drivers have been paid minimum wage for the hours they spend working inside the Dayton Regional Stores.

109.   At all relevant times, Plaintiff and similarly situated delivery drivers have been paid minimum wage minus a tip credit for the hours they spend making deliveries for Defendants.

110.   Defendants require delivery drivers to maintain and pay for operable, safe, and legally compliant automobiles to use in delivering Defendants' pizza and other food items.

111.   Defendants require delivery drivers to incur and/or pay job-related expenses, including but not limited to automobile costs and depreciation, gasoline expenses, automobile maintenance and parts, insurance, cellular telephone charges, GPS capability and/or maps, and other equipment necessary for delivery drivers to complete their job duties.

112.   Pursuant to such requirements, Plaintiff and other similarly situated employees purchase gasoline, vehicle parts and fluids, automobile repair and maintenance services, automobile insurance, suffered automobile depreciation, and incurred cell phone and data charges all for the primary benefit of Defendants.

113.   At all relevant times, Plaintiff and other similarly situated delivery drivers were reimbursed a flat per delivery amount, no matter how many miles the delivery driver travelled to complete the delivery.   Throughout Plaintiff's employment, Plaintiff and similarly situated delivery drivers have been paid $.90 per delivery.

114. At all relevant times, Defendants have failed to pay Plaintiff and similarly situated delivery drivers the legally required minimum wage and overtime wages because they failed to adequately reimburse them for their automobile expenses or other job-related expenses.

115. At all relevant times, Defendants have failed to take reasonable steps to ensure Plaintiff and other similarly situated delivery drivers were adequately reimbursed for automobile expenses and other job-related expenses.

116. Defendants have not attempted to reasonably approximate the automobile and other expenses incurred by Plaintiff and similarly situated delivery drivers for Defendants' benefit.

117. Defendants have not determined Plaintiff and similarly situated delivery drivers' per delivery pay based on an attempt to calculate the actual out of pocket expenses of Plaintiff and similarly situated delivery drivers.

118. Defendants have not monitored or required delivery drivers to monitor the mileage delivery drivers drove while making deliveries, the gasoline purchases made by delivery drivers, or any other out of pocket expenses incurred by delivery drivers.

119. Plaintiff and similarly situated delivery drivers were required to travel up to ten miles away from their Store to make deliveries, with a typical delivery radius approximately 5-6 miles from the Store.

120. Plaintiff and similarly situated delivery drivers typically make approximately 2-4 deliveries per hour, and 15-20 deliveries per shift.

121. Plaintiff and similarly situated delivery drivers regularly drive over 100 miles in a single shift.

15

4811-0304-2865, v. 1

122. According to the Internal Revenue Service, the standard mileage rate for the use of a car during the relevant time periods have been:

    a.    2013: 56.5 cents/mile
    b.    2014: 56 cents/mile
    c.    2015: 57.5 cents/mile
    d.    2016: 54 cents/mile

123. According to the American Automobile Association ("AAA"), driving costs per mile during the relevant time periods have been:

    a.    2013: 60.8 cents/mile
    b.    2014: 59.2 cents/mile
    c.    2015: 58 cents/mile
    d.    2016: to be determined

124. As a result of the automobile and other job-related expenses incurred by Plaintiff and other similarly situated delivery drivers, they were deprived of minimum wage and overtime wages guaranteed to them by the FLSA and Ohio law.

125. At all relevant times, Defendants apply the same pay policies, practices, and procedures to all delivery drivers at the Dayton Regional Stores.

126. Defendants have willfully failed to pay federal and Ohio state minimum wage and overtime to Plaintiff and similarly situated delivery drivers at the Dayton Regional Stores.

**PLAINTIFF'S INDIVIDUAL FACTUAL ALLEGATIONS**

127. Consistent with their policies, patterns, and practices as described herein, Defendants harmed Plaintiff, individually, as follows:

**Kyle Arledge**

128. Plaintiff has worked at Domino's Store #2351, located at 5391 North Dixie Drive, Dayton, Ohio 45414, since July 2015. Plaintiff also worked at Domino's Store #2351 from approximately September 2013 to January 2015.

16

129.    In addition to working at Domino's Store #2351, Plaintiff also worked occasionally at Domino's Store #2291, located at 1450 Kuntz Road, Dayton, Ohio 45404.

130.    When Plaintiff worked at Domino's Store #2291, he was subject to the same employment policies, practices, and procedures to which he is subject at Domino's Store #2351, including policies with regard to his job duties, compensation, expense reimbursement, and delivery radius. Plaintiff was paid on the same paystub for work completed at both Domino's Store #2351 and #2291.

131.    Plaintiff typically works over 40 hours per week for Defendants.

132.    As a delivery driver, Plaintiff delivers pizza and other food items to Defendants' customers' homes and businesses.

133.    When he is not making deliveries, Plaintiff works inside the restaurant, completing tasks such as making pizzas, taking orders, building pizza boxes, taking out trash, sweeping up the food line, and other general tasks within the store.

134.    At all times during his employment, Plaintiff has been qualified to perform the essential functions of his job and has performed his duties competently.

135.    Defendants pay Plaintiff minimum wage for all hours worked inside the store.

136.    Defendants pay Plaintiff minimum wage minus a tip credit for hours he spends making deliveries. Plaintiff's delivery hourly wage rate was $5.00 per hour in 2013. In 2014 or 2015, Plaintiff's delivery hourly wage rate was increased to $5.50 per hour.

137.    Plaintiff regularly drives up to six miles away from his Dayton Domino's Store to make deliveries for Defendants.

138.    Plaintiff regularly makes approximately two to four deliveries per hour during the hours he works as a delivery driver.

17

139. Plaintiff regularly drives between 80 and 100 miles per shift.

140. For example, during a recent week, Plaintiff drove a total of 450 miles to make 101 deliveries.

141. During Plaintiff's employment with Defendants, Defendants failed to adequately reimburse Plaintiff for automobile and other job-related expenses.

142. As a result of unreimbursed automobile expenses and other job-related expenses, Defendants have failed to pay Plaintiff minimum wage as required by law.

**JOINT EMPLOYER ALLEGATIONS**

143. At all relevant times, Defendants jointly employed Plaintiff and similarly situated employees at the Dayton Regional Stores.

144. According to Domino's Annual Report for 2015, it is the number one pizza delivery chain in the United States, holding approximately 28% of the total market share for pizza delivery.

145. In 2015 alone, Domino's grossed $9,700,000,000.00 on delivery sales.  The vast majority of the pizzas and other food items Domino's claims to have sold and delivered in 2015 were delivered by delivery drivers in franchise stores, like Plaintiff and his similarly situated delivery drivers at the Dayton Regional Stores.

146. According to its own Annual Report, Domino's is "primarily a franchised business."

147. In 2015, ninety-three percent—4,816 out of 5,200—of Domino's restaurants nationwide were owned by franchisees.

18

148.    Further, recent trends show that Domino's is becoming even more franchise dominant.  Between 2013 and 2015, Domino's has opened 259 new franchise stores, and 13 new corporate-owned stores.

149.    In fiscal year 2015, Domino's received its largest portion of sales and profits – approximately $272.8 million – through franchise stores like the Dayton Regional Stores.

150.    Conversely, according to Domino's, each franchise store generates an average annual profit of $120,000.00 for itself.

151.    As Domino's explains, their success "is about the strength of the brand itself." "We believe consumers associate our brand with the timely delivery of quality, affordable food."

152.    However, the vast majority of the individuals who actually make those timely deliveries are employed in franchise stores, like the Dayton Regional Stores.

153.    Domino's exercises substantial control over Plaintiff and similarly situated delivery drivers, both directly and indirectly.

154.    Domino's has the power to curtail the unlawful policies, patterns and/or practices alleged herein, but has refrained from doing so in order to continue to reap the profits from the franchise relationship.

155.    Domino's has a clear and direct interest in franchise stores minimizing labor costs to increase profitability—even if it means minimizing labor costs below state and federal minimums—particularly if they are permitted to collect profits while also being insulated from legal liability.

**Domino's Indirectly Exercises Control Over Delivery Drivers by Controlling Franchisees**

156.    Domino's' Standard Franchise Agreement requires franchisees to adhere to the "Domino's System," which requires stores to "conduct business under a uniform business

19

format, with specially designed equipment, computer hardware and software designated by us, and specifications for the preparation and sale of pizza and certain authorized food products."

157.    Adherence to the Domino's System is required, and failure to comply with Domino's policies and procedures can and does result in a franchise's termination.

158.    Through the Domino's System, Domino's controls the actual labor needs of franchise stores, labor budget and allocation for franchise stores, employees' job duties at franchise stores, behavioral policies and procedures at franchise stores, employee training at franchise stores, supply of food, products, and training at franchise stores, advertising and marketing at franchise stores, and the overall operational system and budget of franchise stores, including the Dayton Regional Stores.

159.    Domino's' 800-page Manager's Guide is a "veritable bible for overseeing a Domino's operation … that literally leaves nothing to chance." *Parker v. Domino's, Inc*., 629 So. 2d 1026, 1028-29 (Fa. App. 4th Dist. 1993).

160.    In addition to the Manager's Guide and hundreds of other operational materials provided by Domino's, franchise stores, including the Dayton Regional Stores, are required to purchase, install, and use Domino's' PULSE operating system.  PULSE is a comprehensive operating system, used for point-of-sale functions, and for recording employees' worktime using individual employee codes, tracking employee work tasks continuously, recording tips, tracking pizza delivery information, maintaining personnel data, monitoring store hours and product prices, and generating sales, revenue, and payroll reports.

161.    PULSE is used in 99% of franchise stores.  According to Domino's, PULSE costs between $15,000 and $25,000 per store to purchase and install, and $4,500 per store per year to maintain.

162.    Franchise stores, including the Dayton Regional Stores, are contractually obligated to provide Domino's full access to their business information, therefore Domino's has constant, real-time access to all information stored in PULSE in any franchise store nationwide, and reviews certain aspects of that information from all its stores daily.

163.    PULSE tracks, minute-by-minute, all tasks completed after an order is received, and which employee completes each task.

164.    Domino's uses the PULSE system to closely monitor employee activity.

165.    The PULSE Labor Tools use each store's historical menu mix and sales data to determine what type of employees need to be staffed where, and for how long. The PULSE system and corporate policy indicates to franchisees exactly how many workers they should have depending on precise measurements of workload.

166.    The PULSE Payroll Report is to be used for viewing payroll information, including clock-in and clock-out times, and generating payroll information to give to your accountant or payroll service.

167.    Franchise stores, including the Dayton Regional Stores, are required to adhere to Domino's' conditions regarding property leases and the layout and aesthetic of store itself.

168.    Domino's must approve of all franchisee leases. Leases have to conform with Domino's requirements for its corporate owned locations.

169.    By 2017, all franchise stores, including the Dayton Regional Stores, are expected to convert the physical layout of the store to the "Pizza Theatre" design created by Domino's corporate.

170.    According to Domino's, the Pizza Theatre is designed to minimize costs relating to staffing.

171.    Franchise stores, including the Dayton Regional Stores, are required to contribute 6% of their retail sales to fund national marketing and advertising campaigns. Domino's Pizza, Inc.'s subsidiary, Domino's National Advertising Fund Inc., has authority over how these funds are spent.

172.    Over the past five years, U.S. Domino's stores (93% of which are franchise stores) have invested an estimated $1.5 billion in national, co-operative, and local advertising, according to Domino's' mandate.

173.    Domino's SFA requires new franchisees to spend at least $3,000.00 within the first three months on grand opening advertising and promotion.

174.    Domino's recently underwent an aggressive advertising campaign where they invited and openly acknowledged negative feedback from consumers. As the 2015 Annual Report states, "without the buy-in from our franchise owners, we couldn't have done it."

175.    Domino's requires franchise stores, including the Dayton Regional Stores, to offer substantially the same menu items.

176.    Domino's has created a "vertically integrated dough manufacturing and supply chain," whereby franchise stores, including the Dayton Regional Stores, are required to purchase the ingredients and materials necessary to operate their stores directly from the Domino's Internal Dough Manufacturing and Supply Chain System.

177.    In 2015, Domino's generated $1,383,200,000.00 in revenue from its supply chain alone.

178.    By monopolizing the supply chain, Domino's allows franchisees even less flexibility in allocating their budget.

22

179.    Domino's digital ordering and marketing platforms have also changed the way employees spend their time while working at franchise stores, including the Dayton Regional Stores.

180.    In 2010, Domino's decided "to develop our own online ordering platform and to manage this important and growing area of our business internally."

181.    Franchise stores, including the Dayton Regional Stores, are required to accept orders over Domino's digital platforms, and are not permitted to opt out of Domino's digital ordering platforms.

182.    In 2015, more than half of all sales in the United States (including both corporate owned and franchise stores) were ordered digitally through Domino's' fifteen proprietary digital ordering platforms.

183.    Domino's' digital ordering platforms directly influence the terms and conditions of employment at Domino's franchise stores.  With over fifty percent of orders being placed online without the assistance of an in-store employee, franchise employees' job duties and time at work can and have been re-allocated to other tasks.

184.    In addition to requiring franchisees to pay them for advertising fees, pay them for the PULSE operating system, and pay them for the food and material needed to make Domino's' products, Domino's requires franchise stores to pay to pay 5.5% of royalty sales to Domino's.

185.    Domino's sets employee standards, and enforces those standards through constant communications with franchisees and in-person inspections throughout the year.

186.    Domino's goes beyond the supervision of food quality, instead engaging in co-supervision or co-management of everyday store operations and employee activities.

23

187.     Domino's typically requires prospective franchisees to manage a Domino's location for at least one year prior to entering into the franchise agreement, because "[t]his enables [Domino's] to observe the operational and financial performance of a potential franchisee prior to entering into a long-term contract."

188.     Domino's Franchise Operations personnel provide guidance and supervision to franchise employees through on-site visits and instructions.

189.     In order to deviate from the Manager's Guide, franchisees must apply to Domino's for a "variance," which are rarely granted.

190.     Domino's is in constant communication with franchisees regarding operations, promotions, sales, and any other matters that arise in the store.

191.     In its 2015 Annual Report, Domino's stated, "We maintain a productive relationship with our independent franchise owners through regional franchise teams, distributing materials that help franchise stores comply with our standards and using franchise advisory groups that facilitate communications between us and our franchisees."

192.     At least three times per year, Domino's conducts site inspections of franchise stores, called Operations Evaluations Reports.  A Domino's Evaluation inspector makes an unannounced visit to each store, assessing every aspect of store operations, and awarding it a score from 0 to 100 for compliance with Domino's standards.

193.     Franchise stores who receive low Evaluation scores are given a Notice of Default, and required to submit an action plan to Domino's Area Leaders.  If a franchisee receives three Notices of Default in one year, the franchise can be terminated even if the defaults were corrected.

24

194. In addition to Evaluations, Area Leaders regularly make unannounced visits to franchise stores.

195. Domino's has the power to terminate franchise agreements based on "failure to adhere to specified Company policies and standards." Upon information and belief, those specified policies and standards include failure to operate the store in full compliance with applicable wage-and-hour laws, or to engage in conduct that adversely affects the Domino's brand and the goodwill of Domino's trademarks. Therefore, Domino's is ultimately able to control how its franchisees operate, and could have terminated TJK-ELS's franchise agreements due to their systematic failure to obey federal and state labor laws.

196. By mandating the franchise stores operate on a shoestring budget according to their own detailed policies and guidelines, Domino's controls the terms and conditions of Plaintiff's employment and the employment of similarly situated delivery drivers.

**Domino's Directly Controls Delivery Drivers**

197. Domino's exercises substantial direct control over Plaintiff and similarly situated delivery drivers at the Dayton Regional Stores.

198. Domino's exercises control over hiring at franchise stores, including the Dayton Regional Stores.

199. Domino's, not TJK-ELS or any other franchisee, created the delivery driver job description and job posting for all Domino's stores, including the Dayton Regional Stores and Domino's corporate stores.

200. Delivery driver job positions for the Dayton Regional Stores are posted on the Domino's corporate website, www.dominos.com, and contain identical language to the delivery driver position postings for Domino's corporate stores. The job posting identifies specific job

4811-0304-2865, v. 1

duties and minimum requirements for the job, which are nearly identical across all Domino's stores.

201.    Domino's mandates that applicants undergo a background check before they can be hired at franchise stores, including the Dayton Regional Stores.

202.    Domino's requires background checks upon hire and at every third anniversary for employees in both corporate and franchise stores.

203.    Domino's requires these background checks to be conducted by one of four pre-determined background check agencies, and themselves mandate the process and criteria for a passable background check, with no input from franchisees.

204.    Domino's background check agencies provide franchisees, including the Dayton Regional Stores, with a "meets/does not meet" answer for each job applicant, precluding franchisees from considering individual circumstances, or setting the criteria for employment in the first place.

205.    If an applicant meets Domino's criteria and makes it through the door at a franchise store, their job performance is thereafter measured by reference to standards and metrics laid out by Domino's.

206.    Domino's creates, designs, builds and updates all training and development programs for its franchisees and employees.

207.    Domino's states that franchisees are free to create their own training programs, but any training program must "contain certain minimum content comparable to that found in the Delivery Safety & Security courses and the following courses from High Performance University Core Operations Training – The Basics: 1. New Team Member Orientation – History & Culture,

26

2. New Team Member Orientation – Basic Standards, 3. Safety, 4. Robbery Prevention, 5. Cleaning and Sanitation."

208.    The distances travelled by Plaintiff and similarly situated delivery drivers per delivery is directly decreed by Domino's.

209.    Domino's Standard Franchise Agreement ("SFA") "assign[s] an exclusive area of primary responsibility to each franchised store."   Said differently, Domino's determines the delivery radius for each store.

210.    Pursuant to the SFA, franchise stores are not permitted to modify their delivery radius without seeking approval from Domino's.

211.    Domino's SFA provides that Domino's will proscribe procedures and standards under which franchisees are to determine, on an annual basis, whether certain delivery areas might present a danger to employees.

212.    Domino's exercises significant control over the scheduling and workload of franchise employees, including employees at the Dayton Regional Stores.

213.    Section 12 of the Manager's Guide sets mandatory minimum scheduling and staffing rules for all franchise stores which play a significant role in determining scheduling of those stores' employees.

214.    Domino's corporate employees provide franchisees with instructions on how to schedule, including, e.g., to adjust schedules based on PULSE reports regarding delivery times, to "cross train" drivers on in-store tasks to make it possible to schedule more drivers and fewer in-store employees, to schedule enough delivery drivers to eliminate "triples," or deliveries of three different orders during a single delivery run, and to schedule employees in regular 15-

27

minute increments. These types of directives have a direct impact on the employment of Plaintiff and similarly situated delivery drivers.

215. By eliminating "triples," for example, Domino's corporate restricts Plaintiff and other delivery drivers' income because they drive longer distances and times to collect the same tips and per delivery reimbursement payments.

216. Delivery drivers are required to complete their deliveries within 30 minutes of the order being placed. Franchise stores, including the Dayton Regional Stores, are critiqued based on whether orders were delivered "on-time."

217. Section 12 of the Manager's Guide standards directly impacts franchisee employees' compensation by prohibiting tip jars in franchise stores, because, according to Domino's, "[o]ur system and pricing is established with margins to provide adequate wages to our team members."

218. Domino's has strict and specific requirements about employee appearance, requiring that employees shave daily, specifying the permitted hair length, restricting piercings and earrings, tattoos, sock and undershirt colors, and uniforms to be worn by employees at franchise stores, including the Dayton Regional Stores.

219. The Manager's Guide mandates that delivery drivers, including those at franchise stores, may not carry more than $20 with them during deliveries. Domino's has used this policy to place a franchisee in "default."

220. Domino's also exercises control over discipline and termination decisions. Domino's reserves the right to terminate a franchise if they refuse to comply with Domino's' directives to terminate or discipline an employee.

221. Domino's promotes an anti-union policy to its franchisees.  Specifically, Domino's distributes their own internal union avoidance materials to franchisees, and its HR Director and legal team advise franchisees on how to prevent union activity.  Domino's own head of Human Resources and outside labor counsel have met and consulted with franchise owners regarding potential union activity.

222. In response to some union activity, Domino's distributed materials stating that "There is no union at Domino's, and the company does not want a union here. We will do everything legally possible to keep a union out."

223. Domino's is directly involved in customer and employee complaints at franchise stores, including the Dayton Regional Stores.  Domino's Customer Care Center allows customers and employees to complain directly to Domino's.  Domino's then allows the franchisee five days to remedy the situation, while evaluating the timing and adequacy of the response.

224. Domino's maintains employment records for franchise stores.  PULSE contains employees' clock in/out information, first and last names, descriptions and times spent on various job tasks and other timekeeping data for employees, wage rates, tips reported by drivers, and mileage calculations that could be used to reimburse delivery drivers for delivery expenses. Domino's has total access to this data, and accesses it daily.

**Domino's' Ignored and Profited from the Wage Violations**

225. Domino's' franchise model has been heavily scrutinized for decades.

226. Most recently, on May 23, 2016, the Attorney General of the State of New York accused Domino's of many of the same wage violations Plaintiff alleges herein, and also fraud relating to Domino's' failure to inform its franchisees of wage-related "defects" in the PULSE

system.  *Petition*, *People v. Domino's Inc., et al.* (Sup. Ct. New York County May 23, 2016) (No. 450627-2016).

227.    Domino's has meticulously reviewed and monitored its PULSE systems, and all of its programs and materials for use in its stores.  On a semi-annual basis, Domino's notifies franchisees of various changes and adjustments that have been made to the PULSE system.

228.    Domino's has notified franchisees of hundreds of issues and/or improvements to PULSE over the years, however they have been noticeably silent when a PULSE "defect" results in low-level employees, such as delivery drivers, to be underpaid.

229.    For example, Domino's has been aware since 2007 that the PULSE system does not permit entry of more than one wage rate for the same employee, resulting in delivery employees impermissibly being subjected to the tip credit.  Also, since 2007, Domino's has been aware that PULSE calculates tip credit overtime wages at the wrong rate.[1]

230.    However, despite knowledge of the wage and hour issues created by using PULSE for payroll since 2007, Domino's did nothing to notify franchisees of any problems until May 2015, when they inserted a two-sentence advisement to franchisees tucked within the 800-page Manager's Guide that PULSE was not meant to be a payroll system.

231.    At the same time that Domino's was withholding these PULSE "defects" from its franchisees, Domino's corporate stores had adopted a different software program, PeopleSoft, which contained all of the necessary functions for properly calculating employees' payroll.

232.    Domino's acknowledges that it is "subject to the Fair Labor Standards Act and various other federal and state laws governing … minimum wage requirements, overtime and other working conditions …" and that "[a] significant number of both our and our franchisees'

---

[1] These payroll defects do not apply to Plaintiff's employment at present, but it is not clear whether they have applied to his employment in the past.

food service personnel are paid at rates related to the applicable minimum wage, and past increases in the minimum wage have increased labor costs, as would future increases." Therefore, Domino's is fully aware that it must adhere to federal and state labor laws.

233.    Ninety percent of Domino's franchisees, including TJK-ELS, became franchisees after working as management in a Domino's store.  Koehler, for example, has worked for Domino's since he was 18 years old.  Domino's knows its franchisees rely on Domino's for operational expertise, but have turned a blind eye to underpayments that result directly in Domino's' profits.

234.    Just as Domino's' supply chain is "vertically integrated," so too are the labor policies that relate to Plaintiff and similarly situated delivery drivers.

235.    Domino's has been aware and/or should have been aware of the wage and hour violations alleged herein, and had the authority to stop them from happening.

236.    Along with the other Defendants, Domino's jointly employed Plaintiff and similarly situated delivery drivers at the Dayton Regional Stores.

## COLLECTIVE ACTION ALLEGATIONS

237.    Plaintiff brings the First and Second Counts on behalf of himself and all similarly situated current and former delivery drivers employed at the Dayton Regional Stores owned, operated, and controlled by Defendants nationwide, during the three years prior to the filing of this Class Action Complaint and the date of final judgment in this matter, who elect to opt-in to this action (the "FLSA Collective").

238.    At all relevant times, Plaintiff and the FLSA Collective have been similarly situated, have had substantially similar job duties, requirements, and pay provisions, and have all been subject to Defendants' decision, policy, plan, practices, procedures, protocols, and rules of

31

willfully refusing to pay Plaintiff and the FLSA Collective minimum wage for all hours worked, time-and-one-half overtime pay for hours worked in excess of 40 per workweek, and failing to reimburse delivery drivers for automobile expenses and other job-related expenses. Plaintiff's claims are essentially the same as those of the FLSA Collective.

239. Defendants' unlawful conduct is pursuant to a corporate policy or practice of minimizing labor costs by failing to properly pay Plaintiff and the FLSA Collective.

240. Defendants are aware or should have been aware that federal law required them to pay employees minimum wage for all hours worked.

241. Defendants are aware or should have been aware that federal law required them to reimburse delivery workers for expenses relating to "tools of the trade," such as, among other things, automobile costs and gasoline for delivery drivers.

242. Defendants are aware or should have been aware that federal law required them to pay non-exempt employees an overtime premium for hours worked over 40 per workweek.

243. Defendants' unlawful conduct has been widespread, repeated, and consistent.

244. The First and Second Counts are properly brought under and maintained as an opt-in collective action under 29 U.S.C. § 216(b).

245. The FLSA Collective members are readily identifiable and ascertainable.

246. For the purpose of notice and other purposes related to this action, the FLSA Collective members' names and addresses are readily available from Defendants' records.

247. Notice can be provided to the FLSA Collective via first class mail to the last address known to Defendants.

248.     In recognition of the services Plaintiff has rendered and will continue to render to the FLSA Collective, Plaintiff will request payment of a service award upon resolution of this action.

## CLASS ACTION ALLEGATIONS

249.     Plaintiff brings the Third, Fourth, and Fifth Counts under Federal Rule of Civil Procedure 23, on behalf of themselves and a class of persons consisting of:

> All persons who work or worked as Delivery Drivers and similar employees for Domino's Pizza, Inc., Domino's Pizza, LLC, Domino's Pizza Franchising, LLC, TJK-ELS, Inc., TJK-ELS West End, Inc., Christopher T. Koehler, and/or Edward T. Schlater, Jr. in Ohio between September 2, 2013 and the date of final judgment in this matter ("Rule 23 Class").

250.     Excluded from the Rule 23 Class are Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants; the Judge(s) to whom this case is assigned and any member of the Judges' immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Rule 23 Class.

251.     The number and identity of the Rule 23 Class members are ascertainable from Defendants' records.  The hours assigned and worked, the positions held, and the rates of pay and reimbursement for each Rule 23 Class Member are also determinable from Defendants' records.  For the purpose of notice and other purposes related to this action, their names and addresses are readily available from Defendants.  Notice can be provided by means permissible under Federal Rule of Civil Procedure 23.

252.     The Rule 23 Class member are so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.

253.     There are more than 50 Rule 23 Class members.

4811-0304-2865, v. 1

254.     Plaintiff's claims are typical of those claims which could be alleged by any Rule 23 Class member, and the relief sought is typical of the relief which would be sought by each Rule 23 Class member in separate actions.

255.     Plaintiff and the Rule 23 Class members were subject to the same corporate practices of Defendants, as alleged herein, of failing to pay minimum wage, failing to pay overtime, and failing to reimburse for expenses.

256.     Plaintiff and the Rule 23 Class members have all sustained similar types of damages as a result of Defendants' failure to comply with OMFWSA, Section 34a, and O.R.C. § 4113.15.

257.     Plaintiff and the Rule 23 Class members have all been injured in that they have been uncompensated or under-compensated due to Defendants' common policies, practices, and patterns of conduct.  Defendants' corporate-wide policies and practices affected all Rule 23 Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each of the Rule 23 Class members.

258.     Plaintiff and the Rule 23 Class members sustained similar losses, injuries, and damages arising from the same unlawful practices, polices, and procedures.

259.     By seeking to represent the interests of the Rule 23 Class members, Plaintiff is exercising and intends to exercise his right to engage in concerted activity for the mutual aid or benefit of himself and his co-workers.

260.     Plaintiff is able to fairly and adequately protect the interests of the Rule 23 Class and has no interests antagonistic to the Rule 23 Class.

261.     Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation.

34

262.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation on behalf of minimum wage employees where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.  Because the losses, injuries, and damages suffered by each of the individual Rule 23 Class members are small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Rule 23 Class members to redress the wrongs done to them.  On the other hand, important public interests will be served by addressing the matter as a class action.  The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in significant saving of these costs.  The prosecution of separate actions by individual class members would create a risk of inconsistent and/or varying adjudications with respect to the individual Rule 23 Class members, establishing incompatible standards of conduct for Defendants and resulting in the impairment of the Rule 23 Class members' rights and the disposition of their interests through actions to which they were not parties.  The issues in this action can be decided by means of common, class-wide proof.  In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

263.    Upon information and belief, Defendants and other employers throughout the state violate the OMFWSA, Section 34a, and O.R.C. § 4113.15.  Current employees are often afraid to assert their rights out of fear of direct and indirect retaliation.  Former employees are

4811-0304-2865, v. 1

fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment.  Class actions provide class members who are not named in the complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

264.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

265.    Common questions of law and fact exist as to the Rule 23 Class that predominate over any questions only affecting Plaintiff and the Rule 23 Class members individually and include, but are not limited to:

a.   Whether Defendants paid Plaintiff and the Rule 23 Class members at the proper minimum wage rate for all hours worked;

b.   Whether Defendants failed to reimburse automobile expenses, gasoline expenses, and other job-related expenses, as described herein, causing Plaintiff and the Rule 23 Class members' wages to drop below legally allowable minimum wage and overtime;

c.   Whether Defendants properly compensated Plaintiff and the Rule 23 Class for hours worked in excess of 40 each workweek;

d.   Whether Defendants failed to pay Plaintiff and the Rule 23 Class in a timely manner as described by O.R.C. § 4113.15;

e.   Whether Defendants' policy of failing to pay Plaintiff and the Rule 23 Class was instituted willfully or with reckless disregard of the law; and

f.   The nature and extent of class-wide injury and the measure of damages for those injuries.

## CAUSES OF ACTION

## COUNT I
### Failure to Pay Minimum Wages - Fair Labor Standards Act
### (On Behalf of Plaintiff and the FLSA Collective)

36

266.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

267.    Plaintiff and the FLSA Collective are or were non-exempt, hourly employees entitled to receive no less than minimum wage for all hours worked.

268.    Defendants required Plaintiff and the FLSA Collective to pay for automobile expenses and other job-related expenses out of pocket, failed to reasonably calculate the value of said expenses, and failed to adequately reimburse Plaintiff and the FLSA Collective for said expenses.

269.    By the acts and conduct described above, Defendants willfully violated the provisions of the FLSA and disregarded the rights of Plaintiff and the FLSA Collective.

270.    Plaintiff and the FLSA Collective have been damaged by Defendants' willful failure to pay minimum wage as required by law.

271.    As a result of Defendants' violations, Plaintiff and the FLSA Collective are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, liquidated damages, costs, and attorneys' fees.

## COUNT II
**Failure to Pay Overtime Wages – Fair Labor Standards Act**
**(On Behalf of Plaintiff and the FLSA Collective)**

272.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

273.    Plaintiff and the FLSA Collective worked more than forty hours in one or more workweeks.

274.    Because Defendants required Plaintiff and the FLSA Collective to pay for automobile expenses and other job-related expenses out of pocket, Defendants did not pay

37

Plaintiff and the FLSA Collective at least one and a half times their normal hourly rate for time worked in excess of forty hours per workweek.

275.    By not paying Plaintiff and the FLSA Collective proper overtime wages for time worked in excess of forty hours in a workweek, Defendants have willfully violated the FLSA.

276.    As a result of Defendants' willful violations, Plaintiff and the FLSA Collective are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, liquidated damages, costs, and attorneys' fees.

**COUNT III**
**Failure to Pay Minimum Wages - Ohio Constitution, Article II, § 34a**
**(On Behalf of Plaintiff and the Rule 23 Class)**

277.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

278.    Defendants paid Plaintiff and the Rule 23 Class below minimum wage for the hours they worked by requiring them to cover automobile expenses and other job-related expenses.

279.    Article II § 34a of the Ohio Constitution requires that employees be paid not less than minimum wage as determined by an inflation index (currently $8.10/hour) for all hours worked.

280.    Because Defendants required Plaintiff and the Rule 23 Class to pay for automobile expenses and other job-related expenses out of pocket, Defendants failed pay Plaintiff and the Rule 23 Class minimum wage.

281.    By not paying Plaintiff and the Rule 23 Class at least minimum wage for each hour worked, Defendants have violated the Ohio Constitution, Article II, § 34a.

38

282.    As a result of Defendants' violations, Plaintiff and the Rule 23 Class are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, an additional two times unpaid wages/unreimbursed expenses in damages under Section 34a, costs, and attorneys' fees.

## COUNT IV
### Failure to Pay Overtime Wages – Ohio Minimum Fair Wage Standards Act
### (On Behalf of Plaintiff and the Rule 23 Class)

283.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

284.    Plaintiff and the Rule 23 Class worked more than forty hours in one or more workweeks.

285.    Because they required Plaintiff and the Rule 23 Class to pay for automobile expenses and other job-related expenses out of pocket, Defendants did not pay Plaintiff and the Rule 23 Class at least one and a half times their normal hourly rate for time worked in excess of forty hours per workweek.

286.    By not paying Plaintiff and the Rule 23 Class proper overtime wages for time worked in excess of forty hours in a workweek, Defendants have violated the OMFWSA.

287.    As a result of Defendants' violations, Plaintiff and the Rule 23 Class are entitled to damages, including, but not limited to, unpaid overtime wages, unreimbursed expenses, liquidated damages, costs, and attorneys' fees.

## COUNT V
### Untimely Payment of Wages – O.R.C. § 4113.15
### (On Behalf of Plaintiff and the Rule 23 Class)

288.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

289. During all relevant times, Defendants were entities covered by O.R.C. § 4113.15, and Plaintiff and the Rule 23 Class were employees within the meaning of O.R.C. § 4113.15 and were not exempt from its protections.

290. O.R.C. § 4113.15(A) requires that Defendants pay Plaintiff and the Rule 23 Class all wages, including unpaid overtime, on or before the first day of each month, for wages earned during the first half of the preceding month ending with the fifteenth day thereof, and on or before the fifteenth day of each month, for wages earned during the last half of the preceding calendar month.

291. Plaintiff and the Rule 23 Class's unpaid wages and unreimbursed expenses have remained unpaid for more than thirty (30) days beyond their regularly scheduled payday.

292. In violating Ohio law, Defendants acted willfully, without a good faith basis and with reckless disregard to Ohio law.

293. As a result of Defendants' willful violation, Plaintiff and the Rule 23 Class are entitled to unpaid wages and liquidated damages, as stated in O.R.C. § 4113.15.

**WHEREFORE**, Plaintiff Kyle Arledge prays for all of the following relief:

A. Designation of this action as a collective action on behalf of the collective action members and prompt issuance of notice to all similarly-situated members of an opt-in class, apprising them of this action, permitting them to assert timely wage and hour claims in this action, and appointment of Plaintiff and their counsel to represent the collective action members.

B. Unpaid minimum wages, overtime pay, reimbursement of expenses, and an additional and equal amount as liquidated damages pursuant to the FLSA and supporting regulations;

C.      Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

D.      Designation of Plaintiff as representative of the Rule 23 Class and counsel of record as Class Counsel;

E.      A declaratory judgment that the practices complained of herein are unlawful under Section 34a, the OMFWSA, and O.R.C. § 4113.15.

F.      An award of unpaid minimum wages, overtime wages, and unreimbursed expenses due under §34a and the OMFWSA.

G.      An award of damages under §34a, based on Defendants' failure to pay minimum wages pursuant to §34a, calculated as an additional two times of back wages.

H.      Liquidated damages under O.R.C. § 4113.15 and the OMFWSA.

I.      An award of prejudgment and post-judgment interest.

J.      An award of costs and expenses of this action, together with reasonable attorneys' fees and expert fees.

K.      Such other legal and equitable relief as the Court deems appropriate.


Respectfully submitted,

  /s/ Andrew Biller_____
Andrew Biller (0081452)
Eric Kmetz (092369)
Markovits, Stock & DeMarco, LLC
Easton Town Center
4200 Regent Street, Suite 200
Columbus, OH 43219
(614) 604-8759
Fax (614) 583-8107
(*abiller@msdlegal.com*)
(*ekmetz@msdlegal.com*)
www.msdlegal.com

41

Andrew Kimble (0093172)
Kimble Law, LLC
1675 Old Henderson Road
Columbus, OH 43220
(614) 983-0361
Fax (614) 448-9408
(*andrew@kimblelawoffice.com*)


*Counsel for Plaintiff*


## JURY DEMAND

Plaintiff hereby demands a jury trial by the maximum persons permitted by law on all

issues herein triable to a jury.


_/s/ Andrew Biller_____
Andrew Biller